**H. S. D. CO. v. KAVANAGH, Collector of Internal Revenue.**

No. 11251.

United States Court of Appeals
Sixth Circuit.

June 19, 1951.

832

Wilber M. Brucker, Detroit, Mich. (John F. Langs, Detroit, Mich., on the brief, R. F. Molyneaux, Detroit, Mich., of counsel), for petitioner.

Francis W. Sams, Washington, D. C. (Theron Lamar Caudle, Ellis N. Slack, and S. Dee Hanson, all of Washington, D. C., Edward T. Kane, Roger P. O'Connor, Detroit, Mich., on the brief), for respondent.

Before HICKS, Chief Judge, SIMONS and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant filed a complaint in the district court, asking for a refund of excess profits tax. It claimed that the amount in question was properly deductible from gross income in computing net income to determine income tax liability, on the ground that it was a contribution to two employees' trusts, which were exempt from taxation. The contributions to the trusts were made during the fiscal year ending April 30, 1944; and it was claimed that they were deductible from appellant's gross income for that year under Section 23(p) of the Internal Revenue Code, and Section 165(a) of the Internal Revenue Code, as amended, 26 U.S.C.A. §§ 23(p), 165(a). The district court held that the contributions were not exempt from taxation, and dismissed the suit.

On appeal, the taxpayer contends that the trial court erroneously refused to permit the issues to be determined by a jury; that the government did not sustain the burden of proof which was upon it; that the evidence did not sustain the court's findings that the taxpayer was not entitled to the deduction for the amounts contributed to the trusts; and that the government was bound by the prior rulings of the Commissioner of Internal Revenue that the trusts had met all requirements entitling them to exemption from taxation and that, accordingly, the contributions to the trusts were properly deductible.

The circumstances giving rise to this controversy are as follows: Appellant company, on April 29, 1942, before commenc-

ing certain manufacturing for war needs, executed the two trust agreements in question.

One of the trust instruments, known as the "Employees' Trust," was entered into between appellant company and John F. Langs, Trustee. This was a stock bonus, profit-sharing, and pension plan for hourly-paid employees, to last for ten years, with a possible five-year extension by the Trustee upon the advice, consent, and direction of the Advisory Committee provided for therein. At that time, there were four hourly-paid employees. The corporation was a small company.

The other trust was known as the "Executive Employees' Trust" and was a profit-sharing, stock bonus, and pension plan for the executive officers of the corporation. At that time, there were three such executive officers. The trust was for a five-year period, with a possible five-year extension, at the sole and exclusive direction of John F. Langs, Trustee, provided, however, that the trust would terminate at the death of all of the executive officers. Mr. Langs not only acted as Trustee in each of the trusts, but also was one of an Advisory Board of three members whose duty it was to direct the Trustee's investment of trust funds. Moreover, he was also, during the period in question, the attorney for appellant company.

Both trust agreements contained similar provisions for cash contributions by formula within the amount permitted by statute, subject to appellant company's right to cease making such contributions at any time.

Upon the execution of the trust instruments, appellant company immediately commenced to contribute to the two trusts, and during the three years through April 30, 1944, made the following contributions:

|  | Executive Employees' Trust | Employees' Trust | Both Trusts |
|---|---|---|---|
| Year ended 4-30-42 | $15,551.22 | $ 5,000.00 | $20,551.22 |
| Year ended 4-30-43 | 2,651.75 | 2,999.29 | 5,651.04 |
| Year ended 4-30-44 | 7,500.47 | 8,837.32 | 16,337.79 |
| Totals | $25,703.44 | $16,836.61 | $42,540.05 [1] |

The Trustee had general powers of control over handling and investing the trust funds. When the contributions were made to the trusts, the Trustee invested them largely in the non-voting stock of appellant company, and also in a certain real estate option. Around this option revolves the principal issue in the case.

On June 16, 1942, the company, which had been holding this option to purchase the plant occupied by it in Detroit, transferred it to the Trustee, in his capacity as Trustee for the Executive Employees' Trust, for the sum of $500.00 in cash. This cash had been contributed to the trust by appellant company. Later, on July 30, 1942, the Trustee paid the additional sum of $4,451.95 as the balance of the down payment on a land contract running from the owner to the Trustee. Thereafter, the Trustee made monthly payments of $400.00 through November, 1944, the total sum paid by him up to that time amounting to $16,151.95.

On November 15, 1944, the Trustee sold his vendee's interest in the property to a third party, and on April 2, 1945, he received therefor the sum of $30,396.16, which gave the Executive Employees' Trust a net profit on this land contract transaction of $14,244.21.

Two officers of the corporation, who, among other beneficiaries of the Executive Employees' Trust, were, with their wives,

1. There seems to be some difference in the computation between the facts as set forth in the stipulation and as shown by the exhibits attached thereto, including the Trustee's statements for the trusts during the various years comprising assets and liabilities, receipts and disbursements, and the interest of employees in the trusts. Thus, the stipulation shows a contribution of $15,551.22 to the Executive Employees' Trust for the fiscal year ending April 30, 1942, while the attached exhibit shows a contribution for such fiscal year of $10,000.00, the additional $5,551.22 apparently having been received during the fiscal year of 1943, according to the statement for that year. These differences are, however, not important in this disposition of the case, and for the purposes herein, we follow the figures as set out in the stipulation.

owners of all the outstanding Class A stock of appellant company, which was the voting stock. They were also the owners of 31% of the outstanding Class B non-voting stock.

As a result of contributions by appellant company to the trusts, on April 30, 1945, the Executive Employees' Trust had assets consisting of investments by the Trustee in Class B stock of appellant, of $48,800.00; insurance contracts of $5,380.11; and cash in the amount of $1,235.74. On the same date, the Hourly-Paid Employees' Trust had assets consisting of investments in Class B stock of $11,200.00; and cash in the amount of $1,604.51.

On April 30, 1945, therefore, the Executive Employees' Trust had assets of $55,415.85, and the Hourly-Paid Employees' Trust had assets of $12,804.51.

During the period from April 29, 1942 through April 30, 1945, the Executive Employees' Trust realized a net profit of $31,838.28; the Hourly-Paid Employees' Trust, during the same period, realized a net profit of $73.00—and later, in 1947, a dividend of $672.00 was received by this trust. The statements of assets and liabilities of the Executive Employees' Trust, as of April 30, 1945, showed the interest of four active participants to be $55,415.85. The interest of the participants above mentioned was noted to be subject to the forfeiture limitations and conditions of the trust agreement. All forfeitures reverted to the trust for the remainder of the employees therein. The statement of assets and liabilities of the Hourly-Paid Employees' Trust, as of April 30, 1945, showed the interest of one active participant to be $2,508.74; the interest of one inactive participant, $822.00; the interest of two participants transferred to Executive Employees' Trust, $3,000.00; the interest of participants due to forfeiture previously occurring to be allocated, $1,215.10; and forfeitures to be applied as a reduction on the company's current year's contribution, $5,258.67. It was noted that the foregoing interest of the participants was subject to the forfeiture limitations and conditions of the trust agreement.

During the years in question, there were four participating employees in the Executive Employees' Trust; there were twenty-three Hourly-Paid Employees in the other trust.

All of the foregoing facts were agreed to by the parties in a written stipulation filed in the case.

This case involves the fiscal year ended April 30, 1944. It is, therefore, governed by Section 23(a) and (p) of the Internal Revenue Code, as amended by Section 121 (a) of the Revenue Act of 1942, and Section 165(a) of the Internal Revenue Code, as amended by Section 162(b) of the Revenue Code of 1942.

Section 23(a), as thus amended, provides that in computing net income, there shall be allowed as deductions all ordinary and necessary expenses paid or incurred during the taxable year in carrying on the business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. Section 23(p), as above amended, provides that in computing gross income, contributions made by an employer to or under a stock bonus or profit-sharing plan shall not be deductible under subsection (a), but shall be deductible, "if deductible under subsection (a) without regard to this subsection," under subsection (p). Contribution, therefore, to such an employees' trust, in order to be deductible, must meet the requirements of Section 23(a) as to reasonableness with regard to compensation paid; it must also meet the requirements of Section 23(p) in order to be deductible thereunder; and one of the conditions set forth in Section 23(p) is that the trust, in respect to which the deductions are made, must meet the requirements of Section 165(a).

Section 165(a) (2) and (4) of the Internal Revenue Code, as amended by Section 162 of the Revenue Code of 1942, 26 U.S.C.A. § 165, provides that employees' trusts are exempt from income tax:

"(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the

trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries;

\* \* \* \* \* \*

"(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees."

We come, then, to a consideration of appellant's contentions, and, in so far as necessary to our determination, will discuss them seriatim.

With respect to appellant's claim that the district court erroneously refused to permit the issues to be determined by a jury, it appears that although the taxpayer timely filed a demand for a jury trial, the district court held that in view of the circumstance that all the facts were stipulated, there was no factual issue to be passed upon by a jury. It, accordingly, proceeded to enter findings of fact and conclusions of law holding that appellant's contributions to the trusts were not exempt from taxation, and, therefore, were not deductible from gross income in computing net income for tax liability.

In arriving at its judgment dismissing appellant's suit, the district court found that the employees' trusts were not operated for the exclusive benefit of the employees and their beneficiaries, but were conducted in such a manner as to discriminate in favor of the executive employees, two of whom were substantial stockholders of the corporation; that they were further operated mainly as a means of diverting corporate profits and building up corporate reserves distributable over a period of years to stockholder executives; that the operation of the trusts was a mere subterfuge to build up the employer's reserves and to provide what were, in effect, benefits which discriminated in favor of executive officers who were stockholders, and that, under Section 165(a) of the Internal Revenue Code, as amended, such contributions were not deductible.

None of the facts or factual conclusions set forth in the above paragraph was contained in the stipulation of facts agreed to by the parties. Appellant argued, from the stipulated facts, that the trusts were operated for the exclusive benefit of the employees and their beneficiaries; that they did not discriminate in favor of the executive employees; that they were not mainly operated as a means of diverting corporate profits and as a subterfuge to build up the employer's reserves and provide benefits which discriminated in favor of the executive officers who were stockholders.

In advancing the foregoing contentions, appellant company took the identical position that the Commissioner of Internal Revenue had adopted as to these same trusts in two letters to the taxpayer dated October 23, 1944, and February 13, 1946. The first of these letters was not sent to the taxpayer until two and a half years after it had submitted all the information on the trusts, together with further information thereafter furnished in regard to the amendments made to the trusts during the ensuing years, and had requested a ruling as to whether they met the requirements of Section 165(a) of the Internal Revenue Code, as amended. Having, as set forth in the stipulation of facts, full knowledge of all of the circumstances which had occurred, and all the related data, including the real estate transaction, the resulting profit to the Executive Employees' Trust, and the investment of the trust funds in the taxpayer's stock, the Commissioner thereupon informed the taxpayer, in October, 1944, that "Upon consideration of the plan and a review of the related data, it is the opinion of this office that the plan instituted by you meets the requirements of Section 165(a) of the Code; therefore, the trust(s) established thereunder is entitled to exemption under the provisions of Section 165(a) of the Code."

In the Commissioner's letter to the taxpayer of February 13, 1946, he stated that, under date of October 23, 1944, "a favorable ruling letter" had been issued by him with regard to whether the two trusts met the requirements of Section 165(a) of the Internal Revenue Code, as amended, and

after reciting that the taxpayer had requested a ruling as to whether the plan, since amended, met the requirements of the statute, the Commissioner stated that "Upon consideration of the plan and a review of the related data, it is the opinion of this office that since the plan has been amended as heretofore stated, it now meets the requirements of Section 165(a) * * * and that the trusts established thereunder are entitled to exemption under the provisions of that section. Contributions made to the trusts will be allowed as deductions from gross income in accordance with Section 23(p) of the Internal Revenue Code, as amended, subject, however, to verification upon examination of your return."

In answer to appellant's contentions, which were in conformity with the Commissioner's ruling above mentioned, the government relied upon a subsequent ruling of a newly appointed Commissioner of Internal Revenue, who, on April 8, 1948, disagreed on all points with the former Commissioner, and informed the taxpayer, by letter of that date, that he was of the opinion that the taxpayer's plan did not meet the requirements of Section 165(a) for the reasons that the conduct of the trusts had been of such a nature as not to operate for the exclusive benefit of the employees or their beneficiaries, as required by Section 165(a); that the trust funds had been invested in stock of the company for no purpose other than for the benefit of the employer; that one-half of the employer's contribution to each trust for 1943 was returned to the employer; that the use of the corpus of the trusts in this manner was not in accordance with the statute providing that they be used for the exclusive benefit of the employees or their beneficiaries; and that the operation of the trusts discriminated in favor of the stockholders and supervisory employees, which was prohibited by statute. The Commissioner's letter concluded with the statement that, accordingly, "the opinion expressed by letters dated October 23, 1944 and February 13, 1946, with respect to qualifications of the plan and the exempt status of the trust is revoked and the plan, as amended, will be considered not to have met the requirements of Section 165(a) of the Internal Revenue Code, as amended, retroactively to the inception of the plan and the right of the trusts to exemption has been forfeited as of the time they were instituted."

As far as the facts and law went, there had been no new or additional facts adduced with relation to the taxpayer's plan and the trusts, from the time when the former Commissioner had approved the plan and exempted the trusts from taxation, to the time, four years later, when the new Commissioner rejected the plan and revoked the letters of approval of his predecessor. There had been no change in the law in any pertinent particular. There had been no mistake of fact upon which the former Commissioner had come to any erroneous conclusion. There had, at all times, been full disclosure of the details of the plan, its operations, and the trusts by the taxpayer; and there was no claim that any fraud, misrepresentation, or concealment had at any time induced approval of the plan.

Appellant strenuously contended that, on the evidence, it was entitled to a judgment; that the proofs disclosed, beyond question, that it was entitled to the deductions claimed; that there were no questions of fact properly subject to submission to a jury; but that, if there were any questions of fact in the case, then, because of its demand for a jury trial, it was entitled to have such questions passed upon by a jury. On the same facts, two different Commissioners had arrived at entirely contradictory conclusions; the inferences they drew from the same facts were completely opposed. Assuming, but not holding, that different conclusions could be followed, such conclusions would, in such a case, depend upon the inferences to be drawn from the admitted facts. In its argument that, if there were questions of fact in the case, they should have been submitted to a jury, appellant claimed that the same inferences should be drawn from such facts as had been drawn by the former Commissioner. The government contended for the inferences that had been drawn from the same facts by his successor. The district

court, however, took the view that because of the stipulation of facts, appellant thereby conceded that there were no questions of fact presented for determination, and proceeded to decide the case for the government on the undisputed facts.

■ Where, on undisputed facts, divergent inferences may be drawn, a question of fact is presented for determination as to which of the divergent inferences is to be drawn. In White v. Bingham, 1 Cir., 25 F.2d 837, 838 in an action by executors of a will against the Collector of Internal Revenue to recover a federal estate tax claimed to have been illegally assessed and collected, where the validity of a gift by the deceased was in question, it was held that although the facts relative to the gift were undisputed, divergent inferences might be drawn therefrom, and the validity of the gift was for the jury. The court said:

"The parties have filed a statement of agreed facts, which was made a part of the bill of exceptions by reference, and with the oral testimony at the trial constitutes the evidence in the case.

"The question for our determination is whether this evidence, with all the reasonable inferences to be drawn from it, was of such a clear and conclusive character as to justify the presiding judge in directing a verdict for the plaintiffs, and not submitting to the jury the determination of the validity of the gift to the wife. The facts were undisputed, but it is apparent that divergent inferences might be drawn therefrom. If there were reasonable inferences that might be drawn by the jury from the testimony and the acts of the decedent which would sustain a verdict for the defendant, the validity of the alleged gift should have been submitted to the jury."

■ The determination of what inferences were to be drawn from the admitted facts would be a factual determination. Inasmuch as appellant had demanded a trial of the issues by a jury, it would be entitled to submit its case to such a fact-finding body, if different inferences might be drawn from the admitted facts, and, in such a case, it would be error for the court to dispense with a jury and proceed, itself, to the factual determination. · We are of the opinion, however, that the undisputed facts and all reasonable inferences to be drawn therefrom, entitled—not the government—but the appellant, to a judgment in its favor, and, accordingly, we pass to those aspects of the case that seem to us to be finally conclusive of the controversy.

While the government's argument on the question of whether appellant was entitled to a jury trial appears principally concerned with justifying the inferences drawn from the admitted facts by the present Commissioner, and, in turn, by the district court, to the effect that the trusts had not met the requirements of the statute entitling them to exemption, it also argues, regardless of such inferences, that the proofs conclusively show the trusts were not operated in such a manner as to comply with the exemption requirements of the Internal Revenue Code, as amended, for the reasons that (1) under the trust agreements, the income and corpus of the trusts could be and were diverted to the taxpayer and its stockholder-executives' benefit, being thereby used for purposes other than the exclusive benefit of the taxpayer's regular employees; and that they, therefore, did not come within the exemption provision of Section 165 (a) (2) heretofore mentioned; and (2) because the trusts could be and were so operated and conducted as to discriminate in favor of the taxpayer and its highly paid executive stockholders, and, therefore, did not come within the exemption provision of Section 165(a) (4), heretofore mentioned.

In support of its contention, the government argues that the corpus and funds of the Executive Employees' Trust were regularly diverted and used in large part through investment in the taxpayer's stock, and in real estate transactions, not for the exclusive benefit of the employees, but for the benefit of the taxpayer and its two controlling officer-stockholders, who were also beneficiaries of the trust. As proof of this claim, the government refers to the fact that the day after the trust plan was put into operation, the taxpayer contributed

$10,000.00 to the Executive Employees' Trust, which was converted on the same day into 200 shares of the taxpayer's Class B Treasury stock, "leaving no cash balance in the trust account;" that, likewise, at the same time, the taxpayer contributed $5,000.-00 to the Hourly-Paid Employees' Trust, which was immediately converted into 100 shares of its Class B Treasury stock; that, therefore, it was plain that both the corpus and funds of the two trusts had been invested, to a large extent, during the period from 1942 to 1945, in the taxpayer's stock "for no purpose other than the benefit of the taxpayer and its executive officers." This latter statement with respect to the investment is merely a conclusion. With regard to these transactions, it was entirely proper for the Trustee to invest in the stock of appellant company, and fully in accord with the Treasury Regulation [2] on the subject. The government says, however, that while the Trustee had the right to invest in the stock of appellant company, "nevertheless such circumstances may well indicate that the corpus and/or funds of the trusts, in effect re-transferred to the employer, are being operated for the benefit of a few highly paid supervisory employees, * * *; hence, the benefits inured * * * to the employer * * *." But such circumstances may well, on the other hand, indicate nothing of the kind; and, in the absence of other evidence, would not indicate any such discrimination.

We pass, then, to the government's contention that the real estate transactions carried out by the Trustee with respect to the land and plant where appellant carried on its business demonstrated that there was, in reality, a diversion of the taxpayer's corporate profits for the use and benefit of the company itself and its executive employees and, therefore, none of the contributions to the Executive Employees' Trust with respect to this transaction was within the exemption provision of Section 165(a) (2), inasmuch as they were not used for the exclusive benefit of the employees.

In brief, this was the real estate transaction: On June 16, 1942, the Trustee acquired from appellant the option for the purchase from a third party of the real estate which appellant was occupying under lease. The Trustee thereupon exercised the option to purchase under land contract, effecting a down payment of $4,451.95 out of funds contributed to the trust by appellant company. This amount was retransferred by the Trustee to the taxpayer only to make the down payment for transfer of title to the property into the name of the Executive Employees' Trust. Appellant company itself never had title to the property, but only a lease with option. The Trustee received thereafter monthly rent from appellant of $500.00, and later, $700.-00; and he made monthly payments of $400.00 on the land contract. On November 15, 1944, the Trustee sold his vendee's interest to another party. He had paid an aggregate of $16,151.95 on the contract. During that period, he had collected rent from appellant company aggregating $17,-200.00. The price at which the Trustee sold his vendee's interest was $30,396.16. On the transaction, the Executive Employees' Trust made a profit of $14,244.21. The government declares that this transaction demonstrates that the profit resulted from a diversion of the taxpayer's corporate profits for the use and benefit of itself and the stockholder-executives and not for the exclusive use of the employees. To substantiate this conclusion, the government refers to the fact that when Trustee Langs was on the stand, the court stated to him, with respect to this transaction: "You sold the property too cheap to the trust." This statement was not evidence. The Trustee did not sell anything to the trust, but if the court's statement could be taken as implying a sale of the property at too cheap a price by appellant company to the trust, the answer is that the property was not sold to the trust; the company only transferred to the trust its option to purchase. What was the value of the option, or the value of the property at that time? There was no evidence on the point, and,

2. Treasury Regulation 111, Section 29.165–1(a) (6). (Title 26, Code of Federal Regulations, page 558, 1949 Ed.)

accordingly, no evidence that the option, which was acquired by the Trustee for $500.00, was transferred to him at less than its market value, or that the property itself was secured from the owner, or appellant company—if it could be considered to occupy the position of owner—at less than its reasonable market value on the date the Trustee acquired it. The company had been organized on April 1, 1937, as a manufacturing corporation. It had been operating for five years when it made the transfer of the option to the Trustee. It does not appear when the company executed the lease of the property in question with the owner and acquired the option to purchase. Why it did not purchase the property itself is unexplained. In any event, it never attempted to exercise the option. If the sale of his vendee's interest in the property at a profit by the Trustee, after a period of twenty-eight months, resulted from an increase in value of the real estate during that time, there could have been no diversion of corporate assets for the use of appellant company or its stockholder-executives; and there may well have been, and, in all probability, was a large increase in the value of factory real estate during the years 1942–1945 in Detroit, which was engaged in the greatest industrial activity in the world during the midst of the war.

The Trustee was a witness but was not cross-examined by the government or asked anything about the value of the option or the real estate at the time of its purchase, although he would know more about the situation than anyone else since he was not only the Trustee for each of the trusts and attorney for the trusts, as well as for appellant company, but he was the person who had determined upon the investment. The government did not offer any proof that would indicate that the option or property was acquired at less than reasonable market value, or that appellant company could have purchased the property itself. Not only is there no evidence as to the market value of the option or the property at the time of acquisition by the Trustee, but there is no evidence of the total purchase price of the property which he contracted to pay. There was no proof that the company had transferred the option to the Trustee too cheap, or that it was diverting its profits in this way for its own benefit, or for the benefit of the executive employees. The burden of proof in this regard was upon the government in this case. The taxpayer's right to the deduction had been placed in issue by the government's detailed affirmative defense that the deduction was improperly taken. There having been no deficiency assessment, the government did not have the benefit of a prima facie case; and the burden was, therefore, upon it to establish its affirmative defense and prove its case; and this it failed to do. The government does not contest appellant's claim that the burden of proof was upon it, but says it has met the burden. It has not done so. The proofs do not sustain the claim that the real estate operation was in reality a diversion of the taxpayer's corporate profits for its benefit and the benefit of its executive officers. Squire v. Denman, D.C.Ohio, 18 F.Supp. 287. See also Rainbow Gasoline Corp. v. Comm., 31 B.T.A. 1050, where it was held that there was a presumption of correctness in a deficiency originally proposed by the Commissioner and later claimed by him to have been erroneous, and that the burden of proof was, accordingly, upon him to show that the original deficiency was erroneous; see Vol. 9, Mertens Law of Federal Income Taxation, Section 50.23.

We turn to the claim of the government that the proofs conclusively show that the trusts were operated and conducted in such a manner "as to discriminate in favor of the officer-stockholders and the highly-paid supervisory employees, and therefore, to such extent, in disfavor of the regular employees." To sustain this contention, it refers to the relatively small benefits inuring to the regular employees and the large profits resulting from the Executive Employees' Trust. Thus, for instance, as of the end of the fiscal year, April 30, 1945, the value of the assets of the Executive Employees' Trust was $55,415.85, while the value of the Hourly-Paid Employees' Trust amounted to $12,804.51. There had been, however, at this time, payment of termination and death benefits of $2,605.10 from

the Hourly-Paid Employees' Trust. Without such payment, the Hourly-Paid Employees' Trust would have totaled $15,409.-61. Of course, there is a great disparity between the value of the assets of the two trusts; but it is accounted for by the profits received by way of rent and the sale of the real estate, and the fact that for the fiscal year ended April 30, 1942, appellant company had contributed $10,551.22 more to the Executive Employees' Trust than to the Hourly-Paid Employees' Trust. The income from rent, in the amount of $17,200.-00, and the profit on the sale of the property of $14,244.21—both aggregating $31,344.21 —added to the above contribution, total $41,995.43. If it were not for this amount, the assets of the Executive Employees' Trust would have totaled only $13,420.42, as compared with $15,409.61 of the Hourly-Paid Employees' Trust, and there would be no claim now that there had been any discrimination in the operation of the Executive Employees' Trust.

To sustain appellant's claim for exemption, it is necessary to justify the extra contribution of $10,551.22 to the Executive Employees' Trust for the fiscal year ended April 30, 1942, and also to justify the receipt by this trust of the profits growing out of the rentals and the sale of the property.

As to the payment of the extra contribution of $10,551.22 to the Executive Employees' Trust, it is stipulated between the parties that the amounts contributed by appellant to the two trusts on behalf of the participants therein, when added to the other compensation paid to said employee participants, constituted reasonable compensation within the meaning of Section 23 (a) of the Internal Revenue Code, as amended, and at no time has the Commissioner raised any question concerning the reasonableness of the amounts paid into the trusts on behalf of the participants or credited to their respective accounts as not being proper within this section of the statute.

When this contribution was made— prior to April 30, 1942—there was no provision in the Internal Revenue Code requiring that a plan could not discriminate in favor of employees who were officers or stockholders,[3] as was thereafter provided in the amendments to the Code of October 21, 1942.[4] As the government points out, the provision that the trust plan, to be exempt, must not discriminate in favor of officers, highly-paid supervisory employees, or stockholders appeared for the first time in the 1942 amendments. Prior to such amendments, if the contribution constituted "reasonable compensation," as set forth in the preceding paragraph, it was deductible. See Forcum-James Co. v. Commissioner, 7 T.C. 1195; Surface Combustion Corp. v. Commissioner, 9 T.C. 631; Gisholt Machine Co. v. Commissioner, 4 T.C. 699. The fact, then, that the assets of the Executive Employees' Trust exceed those of the Hourly-Paid Employees' Trust by the amount of this contribution could not be held to be proof of any discrimination. The contribution constituted reasonable compensation; it was made when it was proper to make it, and when it was deductible.[5]

3. See Title 26 U.S.C.A. §§ 23(p) (1) and 165 (1940 Ed.).

4. Title 26 U.S.C.A. § 165 (1945 Ed.).

5. With regard to this contribution of $15,551.22 as of April 30, 1942, it appears that at the time it was made, there were three active participants in the Executive Employees' Trust; one who had been paid a salary for that year of $10,600.00; another was paid a "basic" salary of $8,000.00, and apparently entitled to a share of the profits in addition; and a third member, whose salary does not appear in the record, may be assumed to have received compensation as substantial as the others. In the Hourly-Paid Employees' Trust, as of the same date, when a contribution of $5,000.00 was made thereto, there were four participants. What their yearly income was does not appear; but being hourly-paid employees, it was certainly much less than the income of the executive employees. If the contributions to the trusts were in proportion to the compensation received by the employees, as it probably was, and if, as stipulated, it constituted reasonable compensation to them, the contributions would not be dis-

In the light of the government's claim that the profits received from the real estate transaction by the Executive Employees' Trust, show that it was operated in such a manner as to discriminate in favor of the executive employees, we again turn to that operation in order to ascertain whether the receipt of rents and profits by the Executive Employees' Trust is justified, and the plan, nondiscriminatory.

All of the large profits from this real estate venture arose from the acquisition by the Trustee of the option to purchase the property by land contract entered into in June, 1942. The proofs showed the Trustee paid appellant $500.00 for the option. It nowhere appears what the value of the option was. But if it was transferred to the trust at a figure less than its fair value at the time, the difference would be the amount of a contribution by appellant; and since it was stipulated that the amounts paid by appellant to the two trusts, when added to the other compensation paid to the employee participants, constituted reasonable compensation, the transfer of the option could not be held to be proof of discrimination; for such transfer, assuming it to have been for less than the value of the option, would be a contribution constituting, under the stipulation of facts, reasonable compensation, and valid and deductible under the law prior to the amendments of October 21, 1942. If its actual value was $500.00, the amount paid by the Trustee, it would also be deductible. Under the stipulation that all contributions paid by the appellant constituted "reasonable compensation" to the employees, the option transferred on either of the above theories could not be held to be proof of discrimination in favor of the Executive Employees' Trust. The government claims that "The stipulated facts referred to do not embrace, as compensation, the bargain-value difference in the value of the property at which the executives' trust acquired it from the taxpayer and its real fair market value at the time of acquisition, in addition to the taxpayer's payments as contributions to

such trust and the other compensation regularly paid the executives." If the option was transferred to the Trustee at an amount less than its fair market value, the difference would be a contribution of that amount to the Executive Employees' Trust. We read the stipulation of facts as embracing the contribution of such an amount as reasonable compensation.

It must be here said that the central and crucial fact in this case is that, with respect to the real estate transaction, the Trustee acquired the option and land contract in June, 1942. We might assume, for the argument, that if the Trustee had acquired the property subsequent to the amendments to the Code of October 21, 1942, requiring that a plan not discriminate in favor of employees who were stockholders or officers, then the acquisition of the real estate for the Executive Employees' Trust would have resulted in discrimination and the plan would not have qualified under Section 165(a) of the Internal Revenue Code, as amended, and the trusts would not have been exempt from taxation. But the real estate transaction must be viewed as of the time the Trustee acquired the option and purchased the property, and judged according to the law as it then stood. The government contends that the large profit from the transaction, resulting from the rent collected by the Trustee, and his subsequent sale at such a favorable price three years after he had exercised the option to purchase—in all, $31,344.21, proved discrimination in favor of the Executive Employees' Trust. But this profit, although no one knew how much, if any, it would be, accrued to that trust prior to the effective date of the 1942 amendments. For the government concedes that "The transfer of the property necessarily effected, in turn, the transfer to the trust at the time, in addition to whatever difference there was between the real value and the fair market value thereof, the potential profits which the taxpayer, instead of the trust, stood to make if it had kept the property until it was later sold in 1945 at a large profit."

criminatory. The government does not directly attack the amount of this contribution made to the Executive Em-

ployees' Trust in 1942, but only challenges the use which was thereafter made of it.

Because this transaction occurred prior to the amendments of the Internal Revenue Act of 1942, it can not be considered as evidence or proof of discrimination in the operation of the trusts, for the statutory provision inhibiting such discrimination did not exist at the time of the transaction; and it is to be repeated that there was no proof that the option was worth in excess of the price paid by the Trustee and no evidence of this transaction's resulting in a discriminatory contribution in favor of the Executive Employees' Trust; and the burden of proof was on the government.

The government claims that if the Executive Employees' Trust was a deferred compensation trust, as appellant contends, then the contributions made to establish such trust clearly represented capital expenditures and not deductions as ordinary and necessary business expenses. To this argument, appellant replies that prior to the effective date of the amendments of October 21, 1942, so-called deferred-compensation trusts were valid, and contributions thereto were deductible under Section 23(a) of the Internal Revenue Code, the only criterion being whether the contributions constituted "reasonable compensation" within the meaning of the statute, when added to the other compensation paid to the employee·participants. Appellant concedes that after the Revenue Act of October 21, 1942, amending Section 23(p) of the Internal Revenue Code, deferred compensation could no longer be deducted under Section 23(a) of the Code and that, under the amendment of Section 165(a) of the Code, additional requirements for the exemption of trusts from taxation provided that the trusts be for the exclusive benefit of all of the employees instead of merely some of them, and that contributions or benefits would not discriminate in favor of officers or stockholders. But appellant points out that in this amendatory act of 1942, it was specifically provided, in Section 162(d) thereof, that amounts contributed prior to September 1, 1942, were deductible if "deductible under Section 23(a) or 23(p) prior to the amendments;" and it is our judgment that such contribu-

tions made before the 1942 Act were so deductible.

Many other contentions of· the government appear to us to fail to consider the difference between deferred compensation and employee trusts existing before the amendatory Internal Revenue Act of October 21, 1942, and afterward. Thus, subsequent to the above Act, all contributions made by appellant to the two trusts were based on a uniform percentage of the total basic compensation, applied alike to all beneficiaries, as required in the amended articles of the trusts, and permitted by Section 165(a) (4) of the Internal Revenue Code, as amended. It was likewise argued by the government that the trusts indicated a very close relationship, constituting a single composite plan, and that, therefore, the two trusts should be considered as parts of a single plan for the purpose of determining whether there was discrimination within the meaning of the 1942 amendments to the Internal Revenue Code. Appellant concedes that this is the correct interpretation of the law after the effective date of the 1942 amendments, as provided in Section 162(d); and submits that after the 1942 Act, the trusts were amended to conform with the new requirements, in accordance with the provisions of the· statute, and were thereafter duly approved by the Commissioner as conforming to the requirements of the statute and entitled to exemptions for taxation.

Other objections are raised by the government. It is observed that under the arrangement and operation of the trusts, a few participants are benefited at the expense of the many; that, for instance, four participants in the Executive Employees' Trust would have interests in a fund of $49,150.11 in 1946; that, at the beginning of 1944, there were twenty-three active participants in the Hourly-Paid Employees' Trust entitled to share in $10,708.10; that on November 15, 1944, only one active participant and one inactive participant were entitled to share in such trust, with forfeitures back to the trust amounting to more than $8,000.00; and it is emphasized that this shows rank discrimination. Of

course, the disparity between the interests of the participants of the two trusts is due to the contributions that were made to the Executive Employees' Trust and its real estate operation before the tax amendments of 1942. After that date, as mentioned, all contributions made by appellant were based on a uniform percentage of the total basic compensation of all beneficiaries. However, as the government points out, in 1947, one active participant in the Hourly-Paid Employees' Trust had an interest of $4,681.09; $3,100.00 had already been paid to terminated employees; $1,182.00 remained in the trust for inactive participants; and $8,573.77 was still to be allocated. As to the forfeitures, they were forfeitures to the trust itself. The trust agreement provides that no part of the trust funds can go to anyone except the beneficiaries. They received all of the benefits and assets. None of the assets of the trusts was forfeited to appellant. The forfeitures above mentioned were forfeitures of a portion of the interest of specific beneficiaries which would occur under the terms of the trust, if they left the employ of the company within ten years. Such money would remain in the trust and would accrue to the benefit of the remaining participants. Neither appellant taxpayer or its executives or stockholders would profit thereby. The termination and forfeiture provisions of both trusts were identical; and, with respect to such provisions, all employees in both trusts have been treated identically. Neither the taxpayer nor the Trustee could control the operation of the termination and forfeiture provisions; and forfeitures occurred in both trusts.

A formula by which two stockholders owning 97% of the stock of a tax-paying corporation, received the benefit of more than 50% of the contributions made to an employees' trust, was held by the Tax Court not to be in violation of the requirements of Section 165(a) of the Internal Revenue Code, as amended, since the contributions bore a uniform relationship to the regular rate of compensation, the reasonableness of which the government did not question. Volckening, Inc. v. Commissioner, 13 T.C. 723. In Betty C. Stock-

vis, T.C.Memo, Op.Dkt. 20316, January 25, 1951, where the Commissioner contended that a pension trust was not exempt on the ground that it discriminated in favor of supervisory and highly compensated employees, the Tax Court held that the larger contributions made on behalf of the company's managers, on the basis of their larger salaries, did not result in the plan being discriminatory in favor of such managers. In the instant case, there was no discrimination as to any of the contributions or investments in either of the trusts, subsequent to the amendments of 1942.

With regard to the government's contention that the controlling stockholders and officers dominated the trusts, the Trustee's testimony, which was not contradicted, was to the effect that, in the administration of the trusts, no officer had control, and that he never received instructions from any of the officers or executives as to how the trusts should be operated; that the only direction he ever received was that he should follow out the terms of the trusts. In Forcum-James Co. v. Commissioner, 7 T. C. 1195, it was held of no consequence, in determining the validity of employees' trusts, that seven out of eight trustees were officers and directors of the taxpayer, and a majority were stockholders owning 63% of its stock. See also Gisholt Machine Co. v. Commissioner, 4 T.C. 699.

■ In consideration of the foregoing, we are of the opinion that the plan met the requirements of Section 165(a) of the Internal Revenue Code, as amended, and that the trusts are entitled to exemption.

The final proposition advanced by appellant is that the Commissioner of Internal Revenue was bound by the prior rulings of his predecessor to the effect that the profit-sharing plan met the requirements of Section 165(a), as amended by the Revenue Act of 1942. It is our conclusion that appellant's claim in this regard must be sustained. If our disposition of the case were to be placed exclusively upon this ground, it might well be considered that what had heretofore been said would be little more than dicta. Yet because of the complicated nature of the case and the government's

vigorous insistence that appellant is, by law, neither entitled to the deductions, nor is the Commissioner bound by the prior action of his predecessor, we have concluded that for an adequate determination of the case, it is advisable to pass upon this proposition.

Here was a complicated problem in taxation involving statutes and amended statutes in an area filled with difficulties and uncertainties. The original trusts had been set up prior to the Revenue Act of 1942. That Act showed a strong tendency to deal less tenderly with pension trusts, and various qualifying · requirements were imposed. The additional restrictions and limitations placed upon pension trusts by that Act, as stated by an outstanding authority, represent a compromise between Treasury proposals for the prevention of tax avoidance and the protests of exponents of employee welfare and of taxpayers interested in trusts and plans of that kind. "One result of the 1942 tightening up of the pension trust provisions was the development of a watch-dog attitude on the part of the Bureau for discrimination in such plans and tax-avoidance possibilities. The amendments of the governing provisions, though much more restrictive than before, still left a certain amount of elasticity and room for ingenuity. The Bureau tried to bridge the gap by becoming arbiter in advance of precisely what could and what could not be done. This it attempted to accomplish by formulae and shalt-nots, cautiously phrased and giving not an inch from its original concept of the Congressional intent, as to which the Congress, itself, had not been too clear. The initial accomplishment was merely uncertainty on the part of those who were drafting pension plans, with hundreds of proposed plans piling into Washington for approval, each with its individual problems and variances of motive. * * *

"The 'pension trust' regulations, interpreting the changes made by the 1942 Act in Code Sections 165, relating to pension trusts, and 23(p), relating to deductibility of contributions to pension and profit sharing trusts, were issued by the Commissioner after several months' experience under the new act, which included examination of numerous pension plans presented to him for approval during that period. These regulations are particularly important because the Commissioner has laid down the rules which must be followed for approval of pension and profit sharing plans, and the Code grants the Commissioner the power to give approval of a plan for tax purposes before it is put in effect, a type of approval seldom found in the tax law." Sections 25.70, 25.72, Mertens Law of Federal Income Taxation, 1950 Supp.

. With this unusual authority to approve such employee trusts confided to him by Congress, the Commissioner promulgated multifarious regulations setting forth the requirements necessary to fulfil in order to secure his approval, including the filing with the Collector of affidavits of all matters with regard to the trusts, showing their character, purpose, activities, sources and dispositions of corpus and income, and every fact which might affect their status for exemption, as well as verified copies of the trust instruments and of the employer's plan, showing all amendments; the latest financial statements, showing the assets, liabilities, receipts, and disbursements of the trusts, and the information required to show that the trusts formed part of a stock bonus, pension, or profit-sharing plan of the employer for the exclusive benefit of his employees or their beneficiaries, which met the requirements of Section 165 (a).

Upon receipt of these affidavits and data, the Collector, according to the regulation, was directed to forward them to the Commissioner for decision as to whether the trust was exempt. Regulation 103, Section 19.165(a) (1)—1. See Regulation 111, Section 29.165–1.

All the required information and affidavits were filed by the appellant and considered by the Commissioner in the instant case. What, then, did he have before him, as bearing on the issues here, for his determination as to whether the trusts were exempt? He knew all of the provisions of both trust agreements; that, as of the end of the fiscal year, April 30, 1942, appellant company had made a contribution to the Executive Employees' Trust of $15,551.22,

and, as of the same time, a contribution to the Hourly-Paid Employees' Trust of $5,-000.00. He further had knowledge that the Executive Employees' Trust had acquired from appellant, for $500.00, the option to purchase the real estate and building occupied by appellant; had exercised the option; and had paid the owner $4,451.-95 as the down payment on the purchase under a land contract; that this trust was leasing the property to appellant for $500.-00 a month, and later, $700.00 a month; that it was paying $400.00 a month on the contract; that appellant had made specified contributions to both trusts in 1943 and 1944; that the cash contributions to the trusts, other than payments on the land contract, were invested in the stock of appellant company; that a number of forfeitures under both trust agreements had occurred; that the interest of the four participants in the Executive Employees' Trust amounted to $36,471.64; that the interest of twenty-three active participants in the Hourly-Paid Employees' Trust amounted to $10,708.10; that the interest of two participants amounting to $3,000.00 had been transferred to the Executive Employees' Trust; that the interest of three participants had terminated, with forfeitures to be allocated in the amount of $1,-215.10; and that one trust had been amended five times, and the other, four times. After the submission of all of these matters and on the request of appellant company for a ruling as to whether the plan met the requirements of Section 165(a) of the Internal Revenue Code, as amended by the Revenue Act of 1942, he made his decision on October 23, 1944, that "Upon consideration of the plan and a review of the related data, it is the opinion of this office that the plan instituted by you meets the requirements of Section 165(a) of the Code; therefore, the trust established thereunder is entitled to exemption under the provisions of Section 165(a) of the Code."

On February 13, 1946, the Commissioner, having again been requested, because of further transactions with reference to the trusts and amendments, for a ruling as to whether the plan then met the requirements of Section 165(a), again considered the trusts. At that time, he knew that the property had been sold at a profit of $14,-244.21 by the Executive Employees' Trust; that the interest of four participants in such trust amounted to $55,415.85; that the interest of one active participant in the Hourly-Paid Employees' Trust amounted to $2,508.74; the interest of an inactive participant, $822.00; with forfeitures to be allocated and applied, $6,463.77. The Commissioner, thereupon, "Upon consideration of the plan and a review of the related data," decided again that the plan met the requirements of Section 165(a), and that the trusts were exempt from taxation.

At the time the Commissioner made his rulings in 1944 and 1946, the regulations provided that if the plan was so designed as to amount to a subterfuge for the distribution of profits to shareholders, it would not qualify as a plan for the exclusive benefit of all of the employees; that a plan was not for the exclusive benefit of the employees if it discriminated in any way in favor of the employees who were officers, shareholders, or supervisory or highly compensated employees; that the law was not concerned with form but rather with its effects in operation; and that if a plan, otherwise not discriminatory, was discriminatory in actual operation, it would not comply with Section 165(a).

In the light of these regulations, the Commissioner, therefore, from the extensive data furnished by appellant, and with full knowledge of how the trusts were being conducted, concluded that the conduct of the trusts, for the entire period from their inception, operated for the exclusive benefit of the employees, as required by Section 165(a); that the trust funds were invested for the exclusive benefit of the employees, and that the operation of the trusts did not discriminate in favor of the officers, stockholders, supervisory, and highly paid employees. Twenty-six months later, a new Commissioner of Internal Revenue revoked the two prior letters of approval and ruled that the conduct of the trusts did not operate for the exclusive benefit of the employees; that their operation discriminated in favor of the stock-

holders and supervisory employees;[6] and that the trust funds had been invested in the stock of the company for no other purpose than for the benefit of appellant company.

In Woodworth v. Kales, 6 Cir., 26 F.2d 178, where income tax was assessed in 1919 on profits from the sale of stock based upon its fair value in 1913, and such assessment was approved and confirmed by the then Commissioner of Internal Revenue, it was held that a succeeding Commissioner was without authority, upon a re-examination of the same evidence, to revoke such assessment and reassess an additional tax upon a new valuation resulting from what he claimed was a "matured and better judgment," there being no newly discovered facts, no fraud or mistake, clerical or otherwise, in any fundamental fact, or matter of law. The government contends that later this court qualified its decision in the Woodworth case in Austin Co. v. Commissioner, 6 Cir., 35 F.2d 910, 912, where, it is claimed, the court held that the Commissioner had a right to change a previous ruling upon different fact inferences from the same evidentiary facts. On the contrary, however, the court held that "Even though there was lack of authority to make such (an additional) assessment upon a changed view of the same facts, there was not lack of authority to make it where there was fraud or mistake of law or fact in the original assessment." Moreover, the above case went off on a question of the burden of proof, the court holding that there was no evidence to show on what the Commissioner had acted in making the additional assessment; that he might have acted on new and additional facts which he had conceivably received from later reports of comparative corporations; and that the burden of proof was upon the petitioner. In the instant case, the facts were all stipulated. The reasons for the successor Commissioner's action here were specifically stipulated. They involved no new facts and no mistake of law, but only different inferences from the same facts; and the burden of proof here was upon the government. In Routzahn v. Brown, 6 Cir., 95 F.2d 766, 771, where it was urged that neither the collector nor the Commissioner might waive a defense, Judge Simons observed: "This overlooks the fact that the Commissioner in making a determination of deficiency, or in passing upon a claim for refund, is more than a mere administrative officer. He acts as an administrative tribunal and makes an adjudication which may not by others be set aside." See also Boyne City Lumber Co. v. Doyle, D.C. Mich., 47 F.2d 772, where it was held that the Commissioner's valuation of a taxpayer's property can not be reopened except for fraud, misrepresentation, or gross error, inasmuch as valuation is the result of opinion based upon a prior determination of extrinsic facts, the court observing that it is an insupportable principle to say that such a determination of value may be reopened by each succeeding Commissioner, or by the same Commissioner, because a review of the same facts results in a difference or change of opinion. See also Vestal v. Commissioner, 80 U.S.App.D.C. 264, 152 F.2d 132.

▮ Under the foregoing circumstances, and especially because of the fact that the Commissioner was given the unusual power by Congress to approve the plan and trusts and did so at various times during the course of the years, with full knowledge of all details relating to them and their operations, we are of the opinion that the Commissioner, in this case, was bound by the prior decisions of his predecessor that the plan complied with Section 165(a) of the Internal Revenue Code, as amended, and that the trusts were exempt.

The judgment of the district court is reversed and the case remanded for entry of judgment in accordance with this opinion.

---

6. The Commissioner, in this order of revocation, stated that the interest in the Executive Employees' Trust by the two stockholder participants was approximately equal to 60% of the compensation otherwise paid such participants during years for which the employer made contributions to the trust, whereas the corresponding percentage in the Hourly-Paid Employees' Trust was equal only to 5%. The district court adopted this statement as one of its findings of fact. There was no evidence in the record to sustain the statement, or the finding.