**ABBOTT, PROCTOR & PAINE et al.**

v.

**The UNITED STATES.**

**No. 458–61.**

United States Court of Claims.

April 16, 1965.

Davis, J., dissented.

Charles R. Cutler, Washington, D. C., for plaintiff. Kelley E. Griffith, Washington, D. C., was on the brief.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the briefs.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This case was referred pursuant to former Rule 45(a) (now Rule 57(a)) to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusion of law. The commissioner has done so in an opinion and report filed on February 20, 1964. The defendant has excepted to the opinion and certain of the findings of fact. The parties have filed briefs and the case has been argued orally. The court agrees with the commissioner's findings, his opinion and his recommended conclusion of law as hereinafter set forth and hereby adopts the same as the basis for its judgment in this case. Plaintiffs are, therefore, entitled to re-

cover and judgment is entered for plaintiffs with the amount of recovery to be determined pursuant to Rule 47(c) (formerly Rule 38(c)).*

### OPINION OF COMMISSIONER

The nineteen plaintiffs in this case are licensed brokers in securities and members of the New York Stock Exchange. All are subscribers to the Dow Jones News Service—a service by which teletypewriter machines (sometimes called tickers) located on the premises of subscribers print news on a continuous roll of paper. The news is transmitted by a teletype operator from the Dow Jones central office in New York City over private wires leased from the American Telephone & Telegraph Co. (AT&T) which interconnect with the teletypewriters of all subscribers in the United States. All such teletypewriters are activated by one sending operation so that all subscribers receive the news simultaneously.

During the period November 1, 1957 through May 31, 1959, plaintiffs paid on their subscription charges to the Dow Jones News Service the excise tax of 8 percent for "wire and equipment service" imposed by section 4251, as amended, of the Internal Revenue Code of 1954 (26 U.S.C. § 4251 (1958 ed.)), the amount of which aggregated $125,730.21. They bring suit to recover this sum plus statutory interest.

The case arises under sections 4251, 4252 and 4253, as amended,[1] of the Internal Revenue Code of 1954 (26 U.S.C. §§ 4251, 4252, 4253 (1958 ed.)) which provide in part as follows:

"§ 4251. *Imposition of tax.*

"There is hereby imposed on amounts paid for the communication services enumerated in the following table a tax equal to the percent of the amount so paid as is specified in such table:

| Taxable service | Rate of tax |
|---|---|
| | *Percent* |
| General telephone service ............ | 10 |
| Toll telephone service ................ | 10 |
| Telegraph service ..................... | 10 |
| Teletypewriter exchange service ...... | 10 |
| Wire mileage service ................. | 10 |
| Wire and equipment service .......... | 8 |

"The taxes imposed by this section shall be paid by the person paying for the services."

"§ 4252. *Definitions.*

\*　　\*　　\*　　\*　　\*　　\*

"(f) *Wire and equipment service.*

"For purposes of this subchapter, the term "wire and equipment service" includes stock quotation and information services, burglar alarm or fire alarm service, and all other similar services (whether or not oral transmission is involved). Such term does not include teletypewriter exchange service."

"§ 4253. *Exemptions.*

\*　　\*　　\*　　\*　　\*　　\*

"(b) *News services.*

"No tax shall be imposed under section 4251, except with respect to general telephone service, on any payment received from any person for services used in the collection of news for the public press, or a news ticker service furnishing a general news service similar to that of the public press, or radio broadcasting, or in the dissemination of news through the public press, or a news ticker service furnishing a general news service similar to that of the public press, or by means of radio broadcasting, if the charge for such services is billed in writing to such person.

---

* Judge Davis' dissent in which Judge Laramore concurs appears at the end of the Opinion of Commissioner.

1. These sections of the Internal Revenue Code of 1954 were amended by section 133 of the Excise Tax Technical Changes Act of 1958, P.L. 85–859, 72 Stat. 1275.

" * * * * * * "

As basis for recovery, plaintiffs contend that the Dow Jones News Service is a "news ticker service"; that the legislative history of section 4252(f) shows that news ticker services are not included within the statutory definition of "wire and equipment service"; and, therefore, that there is no basic taxing statute that imposes any tax on subscription charges to the Dow Jones News Service. Defendant disputes this and argues that the tax imposed on amounts paid for "wire and equipment service" includes all payments made for any service employing wire and equipment in the transmission of news or information between a point of origin and the subscriber's premises, and that in any case, the Dow Jones News Service is not a "news ticker service" but rather a "stock quotation and information service" which is expressly taxed under section 4252(f).

Plaintiffs also maintain that even if the Dow Jones News Service should be encompassed in the definition of "wire and equipment service", it is "a news ticker service furnishing a general news service similar to that of the public press" within the meaning of section 4253(b) and that that section exempts from any tax all subscriber payments to the Dow Jones News Service. Defendant's position, to the contrary, is that the exemption afforded by that section is applicable only to payments received from those subscribers of the Dow Jones News Service who are themselves one of the three news media specified by the section, i. e., the public press, a news ticker service furnishing a general news service similar to that of the public press, or a broadcasting agency. Defendant further contends that even assuming the section applies to amounts paid by a non-news media subscriber to a general news service, the Dow Jones News Service does not fall within the exempted category since it does not furnish a general news service similar to that of the public press.

The initial problem thus presented is to determine whether the Dow Jones News Service is a stock quotation and information service or a news ticker service, and if the latter, whether it furnishes a general news service similar to that of the public press.

## I

Dow Jones & Company was founded in 1882 by two reporters who established a business and financial service for the New York business community. In the early years, the information for this service was gathered largely from the Wall Street area and news reports were then written on slips of paper which were distributed by messenger at intervals during the day to the subscribers, most of whom were financial and brokerage houses in New York City. In 1889, the Dow Jones company organized a newspaper venture, the Wall Street Journal, for the primary purpose of printing the day's grist of "slip" news. This was followed in 1900 by the addition of a telegraphic service to provide the same sort of news to subscribers. That service, which became known as the Dow Jones News Service, grew steadily over the years and in 1928 became nation-wide. During the period from 1930 to 1937, the telegraphic method of transmission was replaced by the faster teletypewriter method which is now in use. About one-half of the teletypewriters are owned by Dow Jones, while the others are leased from AT&T.

From 1882 through the early 1930's, the content of the Dow Jones news slips and the Dow Jones News Service consisted mostly of news of corporate activity. However, an evolutionary change took place about 1933 with the advent of the Roosevelt Administration when governmental activities assumed a far greater influence in the lives of people than was the case previously. At that time the content of the Dow Jones News Service was substantially expanded to include governmental, labor and international news.

At present Dow Jones & Company has a staff of 125 reporters who serve both the Wall Street Journal and the Dow Jones News Service. It maintains 23

news bureaus from which news is transmitted to the Dow Jones central office in New York City over teletype wires leased from AT&T. The central office also receives news from part-time correspondents; from press association services (i. e., the Associated Press, United Press International and Reuters, the British news agency); and from various stock and commodity quotation ticker services operated by the exchanges which report individual transactions. At the Dow Jones central office, 17 employees, who work exclusively on the Dow Jones News Service, edit and headline the incoming news and then send it out over the teletypewriter circuits to the subscribers. Dow Jones Averages are printed hourly on the ticker, as are all dividend announcements by corporations listed on the New York Stock Exchange. Apart from that, the editorial staff determines what items will be carried based on their judgment as to whether they will be of interest to the subscribers.

The Dow Jones News Service is designed to provide immediate information about current business, financial, national, international, and other types of general news events to persons who are in business and those who are investors or potential investors. As of June 30, 1962, it had 1,010 subscribers located in 644 cities in 48 of the 50 States. Among the subscribers were 475 brokerage firms; 220 securities dealers; 71 banks; 61 clubs; 46 publishing companies, including newspapers and press association services; 29 manufacturers; and 22 securities and commodities exchanges. The remaining subscribers included various other types of industrial concerns; advertising and public relations agencies; and individuals.

Typically, the Dow Jones News Service operates from 9:00 A.M. to 5:00 P.M. (New York time), Monday through Friday, corresponding to the ordinary hours of occupancy of a business office. On occasion it operates beyond the normal closing time, particularly when compilation of Dow Jones Averages is delayed by reason of the New York Stock Exchange ticker running late. It also will operate beyond the normal closing time to complete the coverage of a major news event of significant interest.

Based on five representative daily transcripts of the Dow Jones News Service, it appears (1) that about 74 percent of its content by lineage and about 84 percent of its content by items are devoted to business and financial news of a kind usually found in the business and financial pages of a daily newspaper; and (2) that about 26 percent of its content by lineage and about 18 percent of its content by items are devoted to general news events similar to those published in daily newspapers.[2]

As to business and financial news, the content of the Dow Jones News Service includes reports on new stock and bond offerings; corporate earnings reports; dividend announcements; corporate financing plans; news about plant expansion and relocations; news about new products and technological developments; merger and acquisition announcements; and corporate sales trends and pricing policies. The content also includes representative stock and bond quotations which are carried periodically during the day to show the trend of the market. Complete stock, bond or commodity quotations are not carried.

The general news items contained in the Dow Jones News Service pertain to events occurring during its hours of service and are similar in content to articles appearing on the front pages and other general news pages of leading daily newspapers. Thus, the service includes fairly detailed articles about major national and international news developments; news concerning Government actions and announcements; news about legislative actions and judicial decisions; labor news; weather reports; etc. However, it does not carry articles that deal

---

2. The contents of daily newspapers may also be classified in essentially the same way. However, there is nothing in the record showing the corresponding percentages of any daily newspaper.

with society, crime, religion, entertainment or the arts unless the event is of general national interest or has significant business implications. It does not carry sports stories unless the event is one of broad interest, such as the World Series—a play-by-play account of which has been transmitted each year for a number of years. Nor does it contain local news, columnists, or advertisements. Examination of the daily transcripts indicates that if a person used the Dow Jones News Service as an exclusive news source, he would become reasonably well informed immediately about the most important national and international news developments but would not get the range of news that he would by reading a daily newspaper such as the New York Times.

Plaintiffs who are brokers subscribe to the Dow Jones News Service to obtain for themselves and to pass on to their customers immediate information about current financial and business developments, and about major national, international and other types of general news events, which information might affect the market investments and financial interests of their customers. Generally they keep the ticker in a room where the tape may be read by customers and the public. While some customers and others who visit plaintiffs' offices read the news on the ticker so that they can make their own analysis of events that may affect them as investors, most customers receive such news by telephone from plaintiffs' employees. Plaintiffs also uniformly subscribe to various ticker services operated by securities and commodities exchanges, and they rely on those services rather than the Dow Jones News Service for actual market quotations. The reason for this is that a stock exchange ticker, as an example, carries complete information about all stock sales as they occur on the floor of the exchange by reporting the latest sales, the number of shares sold, and the price therefor, and hence provides a continuous picture of the market as it changes from moment to moment. Occasionally, a stock exchange ticker also transmits information concerning the expulsion of a member, stock dividends, and notices of the exchange, but does not carry other types of news items such as those dealing with international events, weather, sports, etc.

The Dow Jones News Service, on the other hand, in addition to carrying representative stock quotations at regular intervals during the day to show the trend of the market, as well as a considerable amount of information dealing with market summaries and comments, provides coverage far beyond this. For it transmits a broad range of business and financial news and a quantitatively substantial amount of news devoted to major national, international and other types of general news events. Considering the wide spectrum of its news content, it would be strained indeed to characterize the Dow Jones News Service as a stock quotation and information service within the meaning of section 4252 (f).[3] Rather, it seems apparent from its content that it is most appropriately classified as a news ticker service.

There thus remains for determination the question as to whether the Dow Jones News Service, as a news ticker service, furnishes "a general news service similar to that of the public press" within the meaning of section 4253(b). Neither the Code nor the legislative history of the section provides clear indication of what is meant by the term "general news"; however, the Federal Communications Commission has recently adopted a definition of the term that has applicability here because of the expertise of that Government agency in the communications field with which the present case is concerned  The FCC defined "general news", as follows:

> "The term 'general news' includes an account of current events; public announcements; information relating to finance, science, commerce, re-

---

**3.** The legislative history of this section, which is discussed below, is not helpful in determining what type of ticker serv-ices Congress intended to be encompassed within the term "stock quotation and information services."

ligion, civic or other public organizations; and all like information of general public interest." [4]

In this context, it is apparent that the Dow Jones News Service publishes a substantial amount of general news articles, many of which deal with major national, international and other types of current events; that such articles are carried not as "filler" or occasional highlights but rather as an integral and important part of the Dow Jones News Service coverage; and that many of the articles in this category which are carried by the Dow Jones News Service also appear on the front pages of several prominent newspapers either on the same or following day. Defendant suggests, however, that the fact that the Dow Jones News Service does not generally carry news items dealing with sports, society, crime, religion, the arts or entertainment [5] indicates that it is not a "general news service." But this line of reasoning would lead to the anomalous conclusion that a news ticker service devoted exclusively to coverage of national and international current events, but carrying no news of sports, society, crime, religion, the arts or entertainment, would not be a general news service—a result that Congress could hardly have intended.

Further, it would seem immaterial that the Dow Jones News Service emphasizes business and financial news. In analogous situations involving determinations of what are newspapers of general circulation, the courts hold uniformly that "a newspaper is one of general circulation, even though it is devoted to the interests of a particular class of persons and specializes in news and intelligence primarily of interest to that class, if, in addition to such special news, it also publishes news of a general character and of general interest, and to some extent circulates among the general public." See annotation 68 A.L.R. 538, 541 (1930), and cases there collected.

Similarly immaterial is the fact that subscribers anticipate that their business will benefit by reason of their subscription to the Dow Jones News Service. The determining factor is the content of the service, not its use.

Nor is it without significance that in 1955,[6] the Internal Revenue Service, after careful and thorough consideration of all data and information in its file, as well as data and information furnished by Dow Jones, reached the conclusion— which up to the time of trial herein it has not changed—that the Dow Jones News Service was a news ticker service furnishing a general news service similar to that of the public press, within the meaning of section 4253(b). The Internal Revenue Service reached this conclusion after considering much of the same kind of data and information that has been presented in evidence here. Thus it considered: the contents of daily transcripts of the Dow Jones News Service in comparison with the contents of the New York Times and the Wall Street Journal; data showing the origin of the service, the number of employees, a breakdown of subscribers and related information; a number of sample advertisements; and the manner in which the service was furnished technically. In these circumstances, the agency's determination as to the status of the Dow Jones News Service—while it may not be

4. In the Matter of American Telephone & Telegraph Co., et al. Charges, Classifications, Regulations and Practices For and In Connection With Private Line Services and Channels, etc., Dockets 11645, 11646 (34 FCC 1029, May 27, 1963).

5. In fact, such items are carried when they are of general national interest or have significant business implications.

6. In 1955 the nature and content of the Dow Jones News Service were essentially the same as during the period in suit.

decisive—is nonetheless entitled to some weight.[7]

■ On the basis of all these considerations, it is concluded that the Dow Jones News Service is a news ticker service furnishing a general news service similar to that of the public press, within the meaning of section 4253(b). Consequently it is necessary to determine whether such a news ticker service is included within the section 4252(f) definition of a "wire and equipment service" subject to the excise, and whether, in any event, section 4253(b) exempts from taxation all subscriber payments. This involves the task of construing these statutory provisions, for which purpose the applicable legislative history is now examined to ascertain the Congressional intent underlying their enactment.

## II

For all practical purposes the Revenue Act of 1932 marks the beginning of the legislative history of the Internal Revenue Code pertinent to this case. Section 701 of that Act[8] imposed an excise tax on telegraph, telephone, radio and cable facilities, and read as follows:

"Sec. 701. *Imposition*

(a) On and after the fifteenth day after the date of the enactment of this Act, there shall be imposed—

(1) in the case of each telegraph, telephone, cable, or radio dispatch, message, or conversation, which originates on or after such date and before July 1, 1934, within the United States, a tax at the following rates:

(A) Telephone conversations for which the charge is 50 cents or more and less than $1, 10 cents; for

which the charge is $1 or more and less than $2, 15 cents; for which the charge is $2 or more, 20 cents;

(B) telegraph dispatches and messages, 5 per centum of the amount charged therefor; and

(C) cable and radio dispatches and messages, 10 cents; but only one payment of such tax shall be required, notwithstanding the lines or stations of one or more persons are used for the transmission of such dispatch, message, or conversation; and

(2) a tax equivalent to 5 per centum of the amount paid on or after the fifteenth day after the date of the enactment of this Act to any telegraph or telephone company for any leased wire or talking circuit special service furnished on or after such date and before July 1, 1934. This paragraph shall not apply to the amount paid for so much of such service as is utilized in the conduct, by a common carrier or telephone or telegraph company or radio broadcasting station or network, of its business as such.

(b) No tax shall be imposed under this section upon any payment received for services or facilities furnished to the United States or to any State or Territory, or political subdivision thereof, or the District of Columbia, nor upon any payment received from any person for services or facilities utilized in the collection of news for the public press or in the dissemination of news through the public press, if the charge for such services or facilities is billed in writing to such person. The right to exemption under this

7. It is unnecessary to reach the question as to whether the United States is estopped from challenging the Internal Revenue Service's determination as to the status of the Dow Jones News Service. Cf. H.S.D. Co. v. Kavanagh, 191 F. 2d 831 (6th Cir., 1951); Woodworth v. Kales, 26 F.2d 178 (6th Cir., 1928), cert. den. 280 U.S. 570, 50 S.Ct. 27, 74 L.Ed. 623.

8. Act of June 6, 1932, C. 209, 47 Stat. 169–289. This enactment was extended to 1935 by Act June 16, 1933, C. 90, § 212, 48 Stat. 206; extended to 1937 by Resolution June 28, 1935, C. 333, 49 Stat. 431; and extended to 1939 by Resolution June 29, 1937, C. 402, 50 Stat. 358.

subsection shall be evidenced in such manner as the Commissioner with the approval of the Secretary may by regulation prescribe." [9]

Shortly after enactment of this legislation, the Bureau of Internal Revenue, in response to Dow Jones' request for clarification of its taxable status, issued a letter ruling dated July 16, 1932, which provided: (1) that the collecting and publishing of business and financial news in the manner employed by the Dow Jones News Service involved "the transmission of telegraph dispatches and messages within the meaning of the Act; and that to that extent Dow Jones & Company is a telephone or telegraph company within the meaning of section 701 (a) (2) of the Act, with respect to leased wires"; (2) that Dow Jones should accordingly "collect from its customers

the tax imposed by section 701(a) (1) (B)" on a specified portion of the subscription payments which the Bureau and Dow Jones agreed represented transmission charges; [10] and (3) that since Dow Jones was a telephone or telegraph company, the amounts it paid to the telephone or telegraph company for leased wires and teletypewriters were not subject to the tax.

No statutory changes of significance were made in the period from 1932 to 1940, inclusive.[11] Sections 701(a) and 701(b) of the Revenue Act of 1932 were re-numbered by the Internal Revenue Code of 1939 to sections 3465 and 3466, respectively.[12]

On November 8, 1940, Dow Jones wrote to the Commissioner of Internal Revenue concerning its liability for collection of tax on telegraph, radio or

9. This exemption provision which is commonly known as the "public press" exemption can be traced as far back as section 500(g) of the Revenue Act of 1918, C. 18, 40 Stat. 1102. Press association news services, as well as newspapers, were accorded exemption as part of the public press by Article 20 of Treasury Regulations 42 issued pursuant to the 1932 Act. The exemption was expanded by section 708 of the Revenue Act of 1938 to include radio broadcasting. Act of May 28, 1938, C. 289, 52 Stat. 447–584. News radio broadcasting agencies were included in this exemption by Treasury Regulations 42 as amended by T.D. 4825, 1938–2 Cum.Bull. 402, approved July 25, 1938.

10. Under the Bureau ruling that portion of the subscription charge allocable to the cost and market value of the news service was not taxable. Thus a typical customer paying $100.00 per month for the Dow Jones News Service was deemed by the Bureau to be taxable on $33.00 (this amount representing an estimate of transmission charges), while the remaining $67.00 of the payment was deemed exempted from the tax. The basis for the Bureau's allowance of the exemption is not clear. Plaintiffs say that it constituted tacit recognition that the Dow Jones News Service was part of the "public press." Otherwise, in plaintiff's view, the Bureau, having considered Dow Jones to be a telegraph company, would necessarily have deemed the entire subscription

payment taxable under section 701(a) (1) (B) which imposed for each telegraph dispatch and message a tax of 5 per cent of the amount charged therefor. Defendant, on the other hand, says that the letter ruling indicates that the only reason the Bureau did not hold the entire subscription charge taxable was because at that time the tax was restricted to amounts paid to a telegraph or telephone company for "leased wire" and that there was no tax on "wire and equipment service" as there is under the present Code. Thus in defendant's view, the formula established by the Bureau was an attempt to tax only that portion of the charge attributable to payment for lease of the wire, and to exclude from tax that portion of the payment allocable to a service rendered. This argument would be persuasive save for the fact that the Bureau's ruling as to taxability of subscription charges was predicated *not* on section 701(a) (2) which deals with the tax on the amount paid to a telegraph company for leased wire, but rather on section 701(a) (1) (B) which deals with the tax on telegraph dispatches and messages.

11. The Revenue Act of 1938 expanded the "public press" exemption to include radio broadcasting. See supra, footnote 9.

12. Also sections 701(a) (1) (A) through 701(a) (1) (C) of the 1932 Act were re-numbered sections 3465(a) (1) through 3465(a) (3) of the 1939 Code. Section 701(a) (2) of the 1932 Code was redesignated section 3465(b) of the 1939 Code.

cable messages or facilities under the provisions of section 3465 of the 1939 Code. Replying on December 2, 1940, the Bureau issued the following new ruling reversing its ruling of July 16, 1932:

"The question of whether the charges made by you for news services furnished to your subscribers by means of broad tape printers and teletywriter equipment are subject to tax, either as leased wire services or charges for transmission services, has recently been taken up for reconsideration by the Bureau.

"It is held that Dow, Jones and Company, Inc. is not a telephone or telegraph company within the meaning of subsection (b), section 3465 of the Internal Revenue Code, and that the amounts paid to your company for ticker services do not represent amounts paid to a telephone or telegraph company for leased wire services within the meaning of subsection (b) of section 3465.

"It is also held that the monthly charges made to your subscribers for such news services are not charges for the transmission of messages within the meaning of section 3465(a) of the Internal Revenue Code. Therefore, your company is not liable for collection from your subscribers of the tax imposed by section 3465(a) or (b) of the Code. This ruling supersedes the ruling furnished you on July 16, 1932.

"It is held that the amounts which you paid to the telephone and telegraph companies for the lease of the wires or any other equipment in connection therewith are properly subject to tax under subsection (b) of section 3465 of the Internal Revenue Code. If any of the wires leased by your company are used solely in furnishing news to the public press or gathering news for the public press, the amounts paid for the rental of such wires are exempt from tax.

"Since the telephone and telegraph companies will be liable in the future for collection from you of tax on leased wire services, it is requested that you furnish to this office at your earliest convenience a list of the companies from whom the wires are leased by you.

"The additional evidence required in connection with your claim for refund of tax paid on services furnished to your subscribers where such services are in a local area will be the subject of a separate communication."

This change in concept on the part of the Bureau—from the concept of Dow Jones functioning as a "telegraph company" to the concept of its not functioning as such—had several necessary consequences. First, since Dow Jones was not a "telegraph company," no part of the payment it received from subscribers was subject to the excise. Also, not being a "telegraph company", none of the payments made by Dow Jones to telegraph companies were exempted from tax under the statutory exemption relating to payments for facilities by one telegraph company to another. Hence, payments by Dow Jones to telegraph companies for leased wires and other facilities became subject to the excise tax except to the extent that such facilities were used solely in furnishing news to, or gathering news for, the public press.

The Bureau's 1940 ruling thus relieved Dow Jones from all further obligation to act as a tax collecting agent with respect to its news ticker service revenues. However, the ruling also brought into focus for the first time the status of the wires and equipment leased and paid for by Dow Jones for use in the collection of its news and in its dissemination through its news ticker service. Open to question by the ruling was whether the wires and other facilities it leased from telegraph companies were used solely in the collection and dissemination of news for and by the public press—a question turning on whether or not the Dow Jones News Service was part of the public press on a parity with the press association news services.

Against this background, the House on August 2, 1941, approved H.R. 5417, the bill which was subsequently enacted into the Revenue Act of 1941. Section 548 of that measure, as approved by the House, imposed for the first time a tax on the revenue of "wire and equipment services" and specifically included "news ticker services" in the category of such services. More particularly, section 548 of the bill added a new section 3465(a) (2) (B) to the Internal Revenue Code of 1939 to impose an excise tax equivalent to 5 per cent of the amount paid for:

"(B) Wire and equipment services (including teletypewriter service, burglar alarm service, *news ticker services*, stock quotation and information services, and all other similar services. The tax shall apply under this paragraph whether or not the wires or services are within a local exchange area." (Emphasis added.)

The report of the House Committee on Ways and Means (in which Committee the provision had originated) explained the new section as follows (H.Rept. 1040, 77th Cong., 1st Sess., p. 32):

"The 5 percent tax on leased wires and talking circuits is retained and *the base is expanded* to include wire services such as teletypewriter service, burglar alarm service, *news ticker service*, stock quotation and information services, and the like." (Emphasis added.) [13]

The effect of this provision, it appears, would have been to impose for the first time a tax on the entire subscription charge for the Dow Jones News Service by reason of the specific reference for the first time to "news ticker services" in the taxing provision applicable to "wire and equipment services" and the statement in the House Committee report that the provision involved an expansion of the tax base. In view of these considerations, the "public press" exemption would in all likelihood have been construed as being inapplicable to the Dow Jones News Service despite its position that it was performing solely a "public press" function. Such construction would also have meant that payments made by Dow Jones to telegraph companies for leased wires and other facilities used in the collection of its news and in its dissemination through its news ticker service would not have been covered by the "public press" exemption.

It was in this setting that Kenneth C. Hogate, president of Dow Jones & Company, sent the following letter, dated August 21, 1941, to Senator George, Chairman of the Senate Finance Committee, which was then considering H.R. 5417 as approved by the House: [14]

Re: sections 3465 and 3466 of the 1941 revenue bill.

"Dear Senator George: An attempt would probably have to be made to construe the tax imposed on news ticker services, section 3465, subsection 2 (p. 55, lines 2 and 3), as now worded, as applying to the Dow Jones news service, although that service clearly and undeniably constitutes the public press function of disseminating news. Any such attempt would unquestionably be expensive and embarrassing, because the present language of the bill jeop-

13. The House bill retained the "public press" exemption in approximately the same form as the previously enacted versions thereof.

14. Senator George incorporated this letter in the record of hearings on the bill, stating:

We have here a letter with reference to section 3465 and section 3466 of the 1941 revenue bill which I would like to invite the Treasury's attention to and would like to incorporate it in the record.

It is from Mr. Kenneth Hogate, who calls attention specifically to the ticker service that is covered by this amendment to section 3465 and section 3466. I would like to have that entered in the record and like to have the Treasury see it and make a special note of that in view of the statements made.

Hearings before Committee on Finance, United States Senate, on H.R. 5417 (77th Cong., 1st Sess.), pp. 1384–85.

ardizes Dow Jones recognized press standing of 40 years.

"Section 3466 especially excludes the press from the provisions of the previous section. We are not asking for any special exemption and accept any tax levied on the press. Rather than appear at the hearings on what is really a non-controversial matter, I take the liberty of writing to you, with the respectful request that this letter be entered as part of the committee records so that it will be before the members of the committee when you reach the discussion of these sections of the bill.

"I am sending copy of this letter to the Honorable John L. Sullivan, Assistant Secretary of the Treasury, in the belief that changes which will clearly bring the Dow Jones news service out from under this cloud of doubt will not be resisted by the Treasury.

"May I suggest that the necessary changes could easily be made? They involve only deletion of the words "news ticker services" in section 3465 and defining "the public press" in section 3466 in such a way as expressly to include every method by which press news may be disseminated to the public through the medium of the written word.

"If further information is desired, I shall be most happy to hear from you. I refrain from going into detail simply to conserve your committee's time and because the facts are not in question anywhere."

The Senate Finance Committee in reporting H.R. 5417 to the Senate on September 2, 1941, amended the House bill but not in the form suggested by Mr. Hogate. Rather, it amended that portion of the House bill which proposed to tax "news ticker services" to specifically exclude "news ticker services." Thus, the Senate Finance Committee's version of the proposed new section 3465(a) (2) (B) of the Code imposed:

"(B) A tax equivalent to 5 percent of the amount paid for any wire and equipment service (including stock quotation and information services, and all other similar services, *but not including news ticker services furnishing a general news service similar to that contained in the public press,* burglar or fire alarm service, or service described in subparagraph (A))." (Emphasis added.)

The following excerpts from the Senate Finance Committee Report [15] are pertinent:

"The House bill continued the present rate of 5 percent upon leased wire or talking circuit special service, but added to this category certain wire and equipment services such as teletypewriter service, burglar-alarm service, *news ticker service,* stock quotation and information services. Your committee bill places leased wire, teletypewriters, or talking circuit special services in one category and increases the tax on the amounts paid therefor from 5 to 10 percent. It leaves in effect the 5-percent rate with respect to other wire and equipment services, such as stock quotation and information services, but *specifically excludes news ticker services where a general news service similar to that contained in the public press is furnished.* Likewise, amounts paid for burglar or fire-alarm services are exempted. (Emphasis added.) [16]

\* \* \* \* \* \*

"The bill as it passed the House continues the present 5 percent rate. The amendment increases the rate to 10 percent in the case of leased-wire service, teletypewriter service, and talking circuit special service (which competes with telegraph

15. S.Rept. 673, Pt. I, 87th Cong., 1st Sess. The Senate Finance Committee version did not change the language of the House-approved bill covering the "public press" exemption.

16. Id. p. 20.

service subject to tax under the amendment at 10 percent). Other wire and equipment service is in a somewhat different category, and as to it no change in the 5 percent rate provided by the House Bill is recommended. Burglar and fire alarm service is not taxed under the amendment. *Similarly, news ticker service carrying general news has been exempted from the tax to be consistent with the like exemptions allowed in the case of newspapers with respect to the leased-wire tax.*" (Emphasis added.) [17]

On September 3, 1941, Senator George presented to the Senate the Committee amendment of section 3465(a) (2) (B) and the following occurred (87 Cong.Rec. 7270):

"MR. GEORGE. Mr. President, it may be necessary to make a technical amendment to this section and I ask that if the amendment shall be agreed to, we may have the right to recur to it if necessary.

"THE PRESIDING OFFICER. Is there objection? The Chair hears none, and it is so ordered. The question is on agreeing to the amendment.

"The (Committee) amendment was agreed to."

On September 5, 1941, Senator George offered this "technical amendment" to the Committee amendment which was agreed to by the Senate (87 Cong.Rec. 7363):

"MR. GEORGE. Mr. President, I offer another amendment, which speaks for itself. *It is intended to make certain that the general news ticker service is classed as part of the general press.*

"THE PRESIDING OFFICER. The clerk will state the amendment.

"THE CHIEF CLERK. On page 80, lines 6, 7, and 8, it is proposed to strike out 'news ticker services furnishing a general news service simi-

lar to that contained in the public press.'

"THE PRESIDING OFFICER. In order that the amendment may be considered it will be necessary to reconsider the vote by which the committee amendment on page 80 was agreed to. Without objection, the vote by which the amendment on page 80, line 3, was agreed to is reconsidered, and the question is on agreeing to the amendment offered by the Senator from Georgia to the amendment of the committee.

"The amendment to the amendment was agreed to.

"The amendment as amended was agreed to.

"THE CHIEF CLERK. On page 81, lines 11 and 12, after the word 'press', it is proposed to insert, 'or a news ticker service furnishing a general news service similar to that of the public press.'

"THE PRESIDING OFFICER. The question is on agreeing to the amendment.

"The amendment was agreed to." (Emphasis added.)

The effect of the floor amendments was to eliminate from the Senate Finance Committee version of section 3465 (a) (2) (B) any reference to news ticker services and instead to cause the pertinent portion of the exemption provision (section 3466) to read as follows:

"(b) No tax shall be imposed under section 3465(a) (1) and (2) upon any payment received from any person for services or facilities utilized in the *collection of news for* the public press, or a *news ticker service furnishing a general news service similar to that of the public press,* or radio broadcasting, or in the *dissemination of news through* the public press, or a *news ticker service furnishing a general news service similar to that of the public press,* or by means of radio broadcasting,

17. Id. p. 50.

if the charge for such services or facilities is billed in writing to such person." (Emphasis added.)

The Conference Committee accepted the Senate-passed version of both sections 3465 and 3466 with respect to the amendments dealing with news ticker services. The Conference Committee, in addition, restored the tax on burglar alarm and fire alarm service.

The Conference Report contains the following statement of the managers on the part of the House (H.Rept. 1203, 77th Cong., 1st Sess., p. 15):

"Amendment No. 96:

\* \* \* \* \* \*

"Section 548 of the House bill also imposed a tax equivalent to 5 percent of the amount paid for (A) leased wire or talking circuit special service or (B) wire and equipment service (including teletypewriter service, burglar alarm service, *news ticker service* and stock quotation and information services and all other similar services). The amendment imposes a 10 percent tax with respect to leased wire, teletypewriter or talking circuit special service and a 5 percent tax with respect to amounts paid for wire and equipment service, but not including burglar or fire alarm service.

*"The House recedes with an amendment subjecting burglar and fire alarm service to the 5 percent tax.* (Emphasis added.)

\* \* \* \* \* \*

"Amendments Nos. 98 and 99: The House bill, in certain cases, exempts from the taxes under section 3465 of the Internal Revenue Code, as amended by section 548 of the House bill, any payment received from any person for services or facilities utilized in the collection of news for the public press, or radio broadcasting, or in the dissemination of news through the public press. *The amendments also exempt news-ticker services furnishing a general news service similar to that*

*of the public press; and the House recedes."* (Emphasis added.)

On September 17, 1941, Senator George advised the Senate as follows with regard to the Conference Report (87 Cong., Rec. 7438):

"The Senate amendments with respect to telephone, telegraph and cable dispatches, and so forth, were agreed to with the following exceptions:

"The exemption under the Senate bill of burglar or fire-alarm service from the 5 percent tax with respect to amounts paid for wire and equipment service was eliminated. The tax on local telephone bills which was fixed under the Senate amendment at 10 percent was reduced to 6 percent."

The statutory provisions recommended in the Conference Report were adopted by the Congress and enacted into the Revenue Act of 1941. Since then no changes of substance have been made in the statutory provisions pertinent to the issues in this case. Subsequently section 3465 of the 1941 Act became sections 4251 and 4252 of the Internal Revenue Code of 1954 and section 3466 of the 1941 Act became section 4253 of the 1954 Code.

In considering the foregoing legislative history, it is significant that the House-approved version of the 1941 Revenue Bill contained a provision taxing for the first time "wire and equipment services," specifically including therein "news ticker services"; and that the Senate Finance Committee version of the bill amended that provision to specifically exclude "news ticker services". Thus, the bill as reported to the Senate floor would clearly have exempted from the excise on wire and equipment service all subscription payments to the Dow Jones News Service, assuming it was a news ticker service furnishing a general news service. However, the bill, as thus reported, did not include such news ticker services within the "public press" exemption—an omission which

meant that since the Dow Jones News Service was neither within the "public press" category, nor a telegraph company (by virtue of the 1940 Bureau ruling), its payments to the telegraph company for facilities for use in the collection and dissemination of its news would be subject to the excise tax. Alternatively, the omission of general news ticker services from the "public press" exemption meant that should the Bureau reverse its 1940 ruling and again hold Dow Jones to be a telegraph company, at least a portion of its subscription charges would once more be covered by the excise tax on transmission of telegraph messages. It was in this context that Senator George, obviously acting in part at least on the suggestion contained in the Hogate letter, offered in the Senate the technical amendment—which was subsequently enacted—to amend the Committee amendment by deleting from the taxing section the provision excluding "news ticker services * * *" and to include such services in the "public press" exemption.

The legislative history indicates, however, that Congress did not intend by such action to include "news ticker services" within the category of "wire and equipment services" subject to the excise. For if Congress had so intended, it seems highly likely that rather than deleting "news ticker services * *" from the taxing provision, it would have restored the language of the House-approved bill which specifically included such services—as it did in the case of burglar alarm services. It will be recalled in this connection that the bill as initially approved by the House included "burglar alarm services" within the category of taxable "wire and equipment services" but that the Senate amended the provision to specifically exclude "burglar or fire-alarm services." The conferees included such services within the scope of the excise not by deleting the language of the Senate version, but rather by specifically including "burglar or fire-alarm services" within the definition of "wire and equipment services."

The fact that the conferees did not similarly include "news ticker services" would seem a clear indication of Congressional intent that the newly imposed wire and equipment service excise was not to extend thereto. Another significant indication of Congressional intent is the statement in the Conference Committee Report to the effect that the House conferees *receded* from that portion of section 548 of the House bill which had included "news ticker services" within the category of services subject to the "wire and equipment service" excise. Thus, the Congress specifically considered and rejected the House attempt to include "news ticker services" within the definition of a "wire and equipment service." The conclusion, therefore, seems apparent that Congress did not intend to extend the "wire and equipment service" levy to subscription payments to news ticker services.

Urging a contrary construction, defendant cites Treasury Regulations 42 (1942 ed.), section 130.38(b) (3) (iii) of which provided that "wire and equipment services" include:

> "Channels furnished between a point of origin and the subscriber's premises over which are given stock and bond market quotations and reports, racing results, baseball scores and other sporting results, *news items*, musical programs, weather reports, the time, etc." (Emphasis added.)

Treasury regulations represent, of course, contemporaneous construction of the revenue statutes by those charged with their administration and, consequently, will be given considerable weight by the courts. But the courts are not bound by such construction where it stretches the meaning of a statutory provision beyond what Congress intended (Hampton Roads Ind. Electronics Corp. v. United States, 178 F.Supp. 474, 477, 147 Ct.Cl. 635, 649 (1959), and cases there cited), and to the extent that this regulation is construed to cover news ticker services, it is inconsistent with the intent of Congress.

## III

These considerations aside, it would appear that the effect, among other things, of the George amendment including general news ticker services in the "public press" exemption was to provide an overall exemption from any taxation provision for subscription payments to a general news ticker service.[18] This would seem apparent from the express words of the enactment which provided in pertinent part:

"No tax shall be imposed * * * upon any payment received from any person for services or facilities utilized * * * in the dissemination of news through * * * a news ticker service furnishing a general news service similar to that of the public press * * *"

Defendant says, however, that while at first glance the provision would seem to indicate exemption for all amounts paid to general news ticker services, it is evident from the entire section (supra, p. 334), the grouping of the exemptions, and the partial repetition of the language that the exemption depends upon the nature of the business and the use of the facilities by the taxpayers, rather than upon the nature of the wire service itself. In defendant's view the exemption extends only to amounts paid for a service which is utilized *by the payor* in the dissemination of news through one of the media designated in the statute. Thus, according to the defendant, the exemption is applicable solely to amounts paid by those subscribers of the Dow Jones News Service who are themselves newspapers, press associations, other general news ticker services or broadcasters.

This interpretation, however, not only lacks support in the legislative history, it does violence to the plain meaning of the statute. The statute does not provide that the exemption cover amounts paid for a service which is utilized *by the payor* in the dissemination of news through one of the media designated by the Act—a construction which would make the exemption depend on the nature of the business of, and the use of the facilities by, the person making the payment. On the contrary, the exemption depends on the nature of the service itself. For under the express words of the statute, when the facilities of Dow Jones are used in the dissemination of news to the tickers of its subscribers, then any payment received by "any person" therefor would seem exempt.

Moreover, defendant's construction would lead to anomalous and discriminatory results. To illustrate: all subscribers in Washington, D. C., receive the same news transmitted by Dow Jones from New York to Washington over the same intercity channel. However, Merrill Lynch, as a subscriber in Washington, would be required to pay a tax on the charge made by Dow Jones for the line haul from New York to Washington but the Washington Post, as a subscriber, would not. Yet precisely the same service is furnished to both jointly. Further, if Merrill Lynch were to transmit such news to its 800,000 customers and the Washington Post republished it to no one, under the defendant's contentions, Merrill Lynch must pay the tax but the Washington Post is exempt.

Defendant states, however, that from 1932 to the present, Treasury Department regulations have consistently construed the "public press" exemption as applying only to those amounts paid by news collectors and news disseminators for facilities *used by them* in collecting news or disseminating news through one of the media specified by the statute. According to the defendant, since Congress in successive enactments has not

---

18. The amendment, for example, would prevent Dow Jones from being considered a telegraph company, in which event at least a portion of its subscription charges would be subject to tax. Another effect of the amendment was to exempt from tax payments by Dow Jones to telegraph companies for leased wires and other facilities for use in the collection of its news and its dissemination through its news ticker service.

altered the language pattern, it must be presumed to have sanctioned the construction contained in the regulations.

There are several difficulties with this argument. In the first place, it is not entirely clear that the regulations applicable to the present controversy construe the exemption in the limited manner indicated by the defendant so as to include *only* those amounts paid by news collectors and news disseminators for taxable facilities utilized in collecting news for or disseminating news through a general news ticker service. For example, section 130.45 of Treasury Regulations 42, which were issued under the Revenue Act of 1941, provided in part as follows: [19]

> *"Services utilized in the collection of news for or dissemination of news through the public press, news ticker services, or radio broadcasting.*—(a) The exemption provided by section 3466(b), is applicable only to payments for services and facilities of the kind described in section 3465(a) (1) (telephone toll charges, telegraph messages, etc.) and section 3465(a) (2) (leased wires, etc.). The exemption will apply only with respect to payments for services and facilities which are utilized exclusively (a) in the collection of news for the public press or radio broadcasting or in the dissemination of news through the public press or by means of radio broadcasting, or (b) in the collection or dissemination of news by a news ticker service furnishing a general news service similar to that of the public press. For

the exemption to apply, the charge for the services or facilities must be billed in writing to the person paying for the services or facilities and such person must certify in writing that the services or facilities are so utilized.

> "(b) The exemption applies to amounts charged for messages from any newspaper, press association, radio news broadcasting agency, or news ticker service, to any other newspaper, press association, radio news broadcasting agency, or news ticker service or to or from their bona fide correspondents, which messages deal exclusively with the collection of news items for, or the dissemination of news items through, the public press, radio broadcasting, or a news ticker service furnishing a general news service similar to that of the public press.

> " *   *   *   *   *   * "

Not free from doubt in the face of this language is whether the exemption was intended to apply *solely* to the messages specified in subsection (b) or whether that subsection was intended merely to designate some of the messages with respect to which the exemption is applicable, leaving open the question as to whether payments for messages from a general news ticker service to non-news media subscribers were similarly exempted. Indeed, it could be argued that if the former interpretation were intended, the subsection would have specifically provided that "the exemption applies *only* to amounts charged for messages from   *   *   *." [20]

---

19. This section is substantially similar to section 42.4253–2 of the Treasury Regulations on Facilities and Services Excise Tax issued under the 1954 Code.

20. It may be noted that the regulations issued under the 1932 and 1938 Acts provided specifically that the exemption applied "only" to the messages specified therein. Thus, Article 20 of Regulations 42, promulgated under the Revenue Act of 1932, read in part:
    "The exemption from tax authorized with respect to any payment received

for services or facilities utilized in the collection of news for the public press or in the dissemination of news through the public press applies *only* to amounts charged to newspapers or press associations for   *   *   *   (2) messages from one newspaper or press association to another newspaper or press association,   *   *   *" (Emphasis added.)
See also Treasury Regulations 42 as amended by T.D. 4825, 1938–2 Cum.Bull. 402, approved July 25, 1938.

On the other hand, if the applicable regulations exempt not all subscription payments to a general news ticker service, but only payments made by those subscribers who are themselves news media (e. g., a newspaper, press association, another news ticker service or broadcast agency), such regulations would be inconsistent not only with the plain meaning of the statute, but with its actual administration by the Internal Revenue Service. For the fact is that over a continuous span of 16 years—extending from at least 1941 (when the statutory provision in question was first enacted) to 1957—the Internal Revenue Service failed to seek or assert a tax on subscription payments to the Dow Jones News Service by non-news media subscribers. This tends to support the inference that the Internal Revenue Service considered that the statute exempted all subscription payments to the Dow Jones News Service and not merely those made by subscribers who were themselves news media. "The want of assertion of power by those who presumably would be alert to exercise it has been considered significant in determining whether such power was actually conferred." Equitable Life Assurance Society of United States v. United States, 181 F. Supp. 241, 244, 149 Ct.Cl. 316, 321 (1960), cert. den. 364 U.S. 829, 81 S.Ct. 68, 5 L.Ed.2d 56. What is more, it would appear that the Internal Revenue Service's failure to assert taxability during this period resulted not from lack of consideration of the problem, but rather from a conscious decision on its part, as evidenced by its rulings issued in August and October 1955 that the statutory exemption applied in respect of payments received from *all* subscribers to the Dow Jones News Service regardless of the use made of such service by its subscribers. See findings 38 and 39.[21]

The fact that the Internal Revenue Service adhered to this construction of the "public press" exemption for some 16 years casts doubt, of course, upon the construction of the applicable regulations that defendant urges—since it does not seem credible that the agency would administer the exemption in a manner contrary to its own regulations. But even if defendant's construction of these regulations is the proper one, it does not necessarily follow that Congress should have been presumed to have sanctioned that construction by virtue of its having re-enacted the "public press" exemption without change. For it is just as logical to suppose that re-enactment of this provision without change implied legislative recognition and approval of the established usage of the Internal Revenue Service under which all subscription payments to a general news ticker service were deemed exempt from tax. See e. g., National Lead Co. v. United States, 252 U.S. 140, 145–147, 40 S.Ct. 237, 64 L.Ed. 496 (1920).

DAVIS, Judge (dissenting):

My major difference with the Trial Commissioner's thorough opinion is over the status and effect of the two Treasury Regulations which I believe dispositive and which the court, as I understand the case, must nullify. One regulation relates to the coverage of the tax (Section 4252(f)) and the other to the "public press" exemption (Section 4253(b)). Both, as I appraise them, are adverse to the taxpayers' position, and of course both must be upheld if they are reasonable interpretations of the statute. We are not free to by-pass valid Treasury Regulations. Udall v. Tallman, 85 S.Ct. 792, pp. 795, 800–802, decided March 1, 1965; Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397 (1931); Commissioner v.

21. These rulings revoked a ruling on March 15, 1955, that the exemption applied only to payments by subscribers for the Dow Jones News Service who themselves qualified as one of the three news media designated by th statute. See find-ing 37. On September 20, 1957, the Internal Revenue Service reversed its August and October 1955 rulings and held that the payments in issue here were not exempt. See finding 41.

Wheeler, 324 U.S. 542, 546–547, 65 S.Ct. 799, 89 L.Ed. 116 (1945); Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501–503, 68 S.Ct. 695, 92 L. Ed. 831 (1948); Estate of Bahen v. United States, 305 F.2d 827, 829, 158 Ct.Cl. 141, 145 (1962).

Ever since this tax was imposed in 1941 on "wire and equipment service", the Treasury Regulation has included within that term all "channels furnished between a point of origin and the subscriber's premises over which are given stock and bond market quotations and reports, racing results, baseball scores, and other sporting results, *news items*, musical programs, weather reports, the time, etc." (emphasis added). Treasury Regulations on Facilities and Services Excise Tax (1954 Code), Section 42.-4252–6(b) (3); Treasury Regulations 42 (1942 ed.), Section 130.38. Especially in its context of a wide-ranging, all-inclusive regulation, this paragraph seems to me clearly to cover news tickers such as the Dow Jones Service.[1] Can the regulation nevertheless be disregarded as void? The general words of the statute, taken by themselves, certainly permit the Internal Revenue Service to adopt the position that news tickers are "wire and equipment services."[2] And unlike Commissioner Maletz and the court, I do not find that the 1941 legislative history bearing on the coverage of the tax is so plainly the other way that the regulation must be stigmatized as invalid from its issuance. The House of Representatives originally included news tickers, by name, under the tax; the Senate first excluded them specifically and then deleted all references to them from the coverage section of the bill; the final measure hammered out by the conference did not mention them one way or the other in the coverage provisions. To my mind, there is not much help from the legislative background, or the reports and debates, in explaining this final solution. The letter from Mr. Hogate of Dow Jones is very unclear as to whether he was concerned with the *coverage* of the tax or with the "public press" *exemption* (and, if the latter, with the taxability of Dow Jones itself or also with the taxability of its subscribers). Senator George was cryptic in asking to delete the original Senate provision expressly excluding news tickers from coverage; his comment ("it is intended to make certain that the general news ticker service is classed as part of the general press") could well mean that only the exemption, not coverage, was at issue and, even then, only Dow Jones' own exemption. The conference report is wholly colorless on this point. Complex and refined inferences, based on small differences in wording, may be drawn, not without some persuasive appeal, to support the taxpayers' position, but for me the upshot of the 1941 legislative consideration of news tickers is that we cannot say with the requisite certainty that Congress affirmatively intended to exclude these services from the extension of the tax to "wire and equipment services". That being so, I cannot brand the Treasury's contemporaneous regulation, now twenty years old, as inconsistent with the Congressional aim. Following that regulation, I would hold that Sections 4251 and 4252(f), imposing the tax, embrace the Dow Jones News Service.

The other regulation, dealing with the exemption for the "public press" (Section 4253(b)), is Section 42.4263–2 of the Treasury Regulations on Facilities and Services Excise Tax (1954 Code) (which the court's opinion quotes in the earlier version, Section 130.45 of Treasury Regulations 42). This part of the regulations declares that the statutory exemption extends to those using a wire and

---

1. There is no contention that the Internal Revenue Service has ever interpreted *this* regulation as inapplicable to the Dow Jones Service.

2. As enacted in 1941, the tax was imposed on *"any"* wire and equipment service;

and the specification of services comprised in that term ended with the general phrase *"and all other similar services"* (emphasis added). The 1954 Code retains the latter phrase.

equipment service in the course of collecting or disseminating news for or through the "public press." The Washington Post or the Associated Press, for instance, would not have to pay the tax on their subscriptions to a news ticker. Admittedly, the stockbroker-plaintiffs do not employ the Dow Jones Service in that fashion.

The court and the Commissioner first say that the present regulation and its 1942 predecessor may not confine the exemption to the defined class since they do not, unlike the earlier editions, use the word "only" with respect to that class. This puts too much weight on a slight literary alteration made when the regulation as a whole was recast to cover the 1941 addition of wire and equipment services; the word "only" was placed in another portion (paragraph (a)) of the revised regulation and the definition of the exempted class was put separately in paragraph (b). It is hard to read the regulation as differing, on this point, from the pre-1941 promulgations which indisputably exempted only persons using communications services for the collection or dissemination of news for or through the press. We cannot escape, as I see it, the question of the validity of the regulation.

On that issue, I start with the tortuous and ambiguous wording of Section 4253 (b) exempting "News Services." It is in just such cases that interpretative regulations must be accorded their fullest scope. Cf. National Lead Co. v. United States, 252 U.S. 140, 145, 40 S.Ct. 237, 64 L.Ed. 496 (1920); White v. Winchester Country Club, 315 U.S. 32, 35–36, 41, 62 S.Ct. 425, 86 L.Ed. 619 (1942); American Sugar Refining Co. v. United States, 56 F.Supp. 988, 991, 102 Ct.Cl. 180, 186 (1944). From 1918, when the first communications tax was imposed (Revenue Act of 1918, 40 Stat. 1057, 1102, Section 500(g)), the Treasury, in its general pronouncements, has confined

the "public press" exception to the collection and dissemination of news for or through the press. At first, the statement of that position seems to have been left wholly to the concise but clear words of the earlier legislation itself. In 1932, Article 20 of Treasury Regulations 42, issued under the Revenue Act of 1932, spelled out the exemption in detail. An amendment in 1938 (T.D. 4825, 1938–2 Cum.Bull. 402), after the 1938 Revenue Act expanded the exemption to radio, carried the same conception forward and applied it to broadcasting. After the 1941 Act added "wire and equipment services", Treasury Regulations 42 (as already pointed out) took the same position, as did the comparable regulation under the 1954 Code. This is a period of over forty-five years in which the Treasury's general thinking has been opposed to applying the exemption to non-media taxpayers such as those before us.

This long history outweighs, in my scales, the two-year period (1955–1957) during which the Internal Revenue Service said that subscribers to the Dow Jones Service were exempt.[3] That summary ruling did not explain its conclusion or cite the regulation, and, if I must choose between the long-standing public interpretation and this short-lived private ruling as the true reflection of the Treasury's general position, I am compelled to choose the former. Nor do I think that the Treasury's position can be gathered from its apparent failure to attempt, for some years, to collect the tax payable by non-press subscribers. In the field of taxation it is precarious to draw inferences from non-collection when published regulations provide for payment of the tax. There are too many practical and pragmatic reasons why the taxpayers may have been left unharried.

Lastly, I consider the 1941 legislative history, once again, too inconclusive for us to say that it conflicts with the regula-

3. I do not believe the other rulings which Dow Jones received (in 1932 and 1940) on the communications tax have been shown to be inconsistent with the Government's understanding of the regulation. On the contrary, the 1940 ruling stated explicitly that the exemption depended on the subscriber's use.

tion. That history demonstrates that Congress desired Dow Jones itself to be free of the tax, but it is wholly equivocal on the exemption of non-press subscribers to the News Service; if anything, the balance can be read to favor the defendant. The regulation stands unimpaired and should be applied to plaintiffs.

They urge that, if the Code requires them to pay the tax, it is unconstitutional as an infringement of First Amendment rights. But these stockbrokers, who employ the Dow Jones News Service in their business, cannot complain that any rights of theirs are violated by the requirement that they pay an 8% tax on their use of a wire service, any more than they can refuse to pay the telephone or telegraph tax or a sales impost. Nor are the rights of Dow Jones broken by this minor and non-discriminatory excise tax, payable by business subscribers, on the transmission of news (as well as other information) by wire. Cf. Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 112, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Follett v. Town of McCormick, 321 U.S. 573, 577–578, 64 S.Ct. 717, 88 L.Ed. 938 (1944); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 192–194, 66 S.Ct. 494, 90 L.Ed. 614 (1946); Mabee v. White Plains Publishing Co., 327 U.S. 178, 184 (1946).

LARAMORE, Judge, concurs in the foregoing dissenting opinion.

Davis, J., dissented.